**SO ORDERED.**

**SIGNED this 31st day of August, 2012.**




Dale L. Somers
United States Bankruptcy Judge

---

Designated for print publication
**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

In re:

**PHILIP DUANE LUNT,**

     **DEBTOR.**

**CASE NO. 10-13712
CHAPTER 7**

**MEMORANDUM OPINION AND JUDGMENTS
DENYING DEBTOR'S MOTION FOR SUMMARY JUDGMENT AND
GRANTING ELAINE L. STELTER AND STEVEN A. LUNT'S
CROSS MOTION FOR SUMMARY JUDGMENT**

   In this re-opened Chapter 7 case, Debtor Philip Duane Lunt requests the Court to

hold The Peoples Bank as Trustee (Trustee) of the Harry B. Lunt Trust (Trust) in

contempt for violation of the discharge injunction.[1]  The basis for the alleged violation is

the Trustee's offsetting of a 2010 distribution of Trust income to Debtor to satisfy

Debtor's obligation to the Trust for interest on a November 7, 1985, note (Note), even

---

[1] Dkt. 160.

though Debtor's personal liability on the Note was discharged by an order entered in this case on July 19, 1989. The Court has jurisdiction.[2] Debtor moves for summary judgment on his motion to find the Trustee in contempt for violation of the discharge injunction, seeking an award of actual damages of $4,811.00 and his attorney fees for the Trustee's alleged willful violation of the discharge injunction, plus punitive damages for the Trustee's alleged bad faith violation of the discharge injunction.[3] The Trustee opposes Debtor's motion.[4] Debtor's sister, Elaine L. Stelter (Elaine), and his brother, Steven A. Lunt (Steven), beneficiaries under the Trust, were granted leave to participate in summary judgment briefing.[5] They oppose Debtor's motion for summary judgment and move for summary judgment,[6] contending that the Trustee's actions were authorized by the Trust and did not violate the discharge injunction.

## UNCONTROVERTED FACTS.

The parties agree which documents and events are relevant to this controversy. The Court finds the following facts are uncontroverted for purposes of the cross motions

---

[2] This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and §§ 1334(a) and (b) and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984. A motion for contempt for violation of the discharge injunction is a core proceeding which this Court may hear and determine as provided in 28 U.S.C. § 157(b)(2)(A). There is no objection to venue or jurisdiction over the parties.

[3] Dkt. 211.

[4] Dkt. 222.

[5] Dkt. 228.

[6] Dkt. 233.

2

for summary judgment.

The Trust was established in 1978 by Harry B. Lunt (Harry or Grantor), the father of Debtor, Elaine, and Steven (the Lunt Children). On November 7, 1985, the Trust entered into a contract with Debtor and Debtor's wife, Rose Ann Lunt, for the sale of a farmhouse to Debtor and Rose Anne. The purchase price was $50,000.[7] In partial payment for the home, Debtor and Rose Ann executed the Note, dated November 7, 1985, for $33,333.33 payable to The Peoples Bank as Trustee. The Note provides for interest at the rate of 10% per annum, payable from the date of the transfer of the property. The principal is due in five years. Although the contract provides for transfer of the farmhouse to Debtor and Rose Ann, the deed dated November 7, 1985, conveyed the farm house only to Rose Ann. But it is uncontroverted that Debtor has lived in the farm house since the transfer.

Debtor filed for relief under Chapter 7 on November 25, 1988. The Peoples Bank and the Trustee were listed as creditors. A proof of claim for payment of the Note was filed. Debtor was granted a discharge on July 19, 1989. The parties agree that the Note was within the scope of the discharge order.

The Grantor created the Trust, which is governed by Kansas law, by an instrument dated December 27, 1978. The Peoples Bank of Pratt is named as the Trustee. The Trust agreement was amended in its entirety by an Amendment to Trust Agreement dated

---

[7] The Note was therefore for two-thirds of the purchase price. There is no evidence that Debtor paid the Trust the other one-third of the value. In essence therefore, through the Note, Debtor agreed to pay the Trust Elaine and Steven's share of the value of the home.

3

March 29, 1984, and by a limited Amendment of Trust Agreement signed on November 7, 1985, addressing the Note. A purpose of the Trust was to provide for the Grantor during his lifetime. Upon his death, a marital trust and a non-marital trust were created, and distributions from the marital trust were made to Christine Lunt, Harry's wife and the mother of the Lunt Children. The Trust provides that upon the death of Christine, which occurred in 2004, the two trusts are to be administered as one for twenty years, after which the Trust will terminate. Upon termination, the Lunt Children are entitled to distributions of all principal and accrued and unpaid income.

The following specific terms of the Trust are relevant. The Trustee is given "all powers expressly set forth in the Uniform Trustees Power Act (K.S.A. 58-1201, et seq) as may be amended from time to time" and other powers set forth in the 1984 Amendment to Trust Agreement.[8] After Christine's death, Article VI(A)(3)(b) of the 1984 Amendment to Trust Agreement, a subsection of the martial trust provisions, gives the Trustee discretion to make distributions of income to the Lunt Children as follows:

> [T]hen upon the death of Grantor's wife, the Trustee shall continue to hold any accumulated income and principal in trust and shall administer the same as follows:
> . . . .
>
> > b. All or any part of the income of this trust may be distributed at any time and from time to time and for any reason for the benefit of the Grantor's children in such proportions and amounts as the Trustee may determine, it being the intention hereof to

---

[8] 1984 Amendment to Trust Agreement, Article VII.

> vest in the Trustee the sole and absolute power to
> distribute or not distribute amounts of income at such
> times and in such proportions among said individuals
> as it deems appropriate.

Also, under Article VI(C) of the 1984 Amendment to Trust Agreement, after the death of

Christine, the marital trust and the non-marital trust are treated as one and administered as

provided in the Amendment for a period of twenty years, when the Trust terminates.

Upon termination of the Trust, Article VI(C)(4) provides for equal distributions to the

Lunt Children, as follows:

> Upon termination, the Trustee shall distribute the
> principal and any accrued and undistributed income of the
> trust in equal shares to the children of the Grantor, provided,
> the Trustee is authorized and empowered to make unequal
> distribution of the principal and any accrued and undistributed
> income in cash or in kind in order to carry out the desires of
> the Grantor for the Trustee to consider all transfers to
> Grantor's children that have been made by the Grantor or his
> wife by Will or otherwise.  Any loans made by Grantor or his
> wife which have not been repaid shall be treated as transfers
> by the Trustee, whether or not the statutes of limitation have
> run.

The Amendment of Trust Agreement executed on November 7, 1985, the date of

the Note, states in part:

> The Trustee is hereby directed to enter into the
> attached contract on behalf of the Trust, to accept the notes as
> required in such contract . . . and to execute the deed in the
> form as attached hereto, to carry out the terms of the contract.
> The Trustee is further directed that upon the death of
> the survivor of myself and my wife . . . and collection of the
> note to the Trustee in the amount of . . . $33,333.33 . . . ,
> whichever event shall last occur, to distribute one-half (½) of
> the principal of such note to my son, Steven A. Lunt and one-

5

half (½) to my daughter, Elaine Lunt Stelter.

As found above, the home transferred from the Trust to Debtor and his wife was valued at $50,000. Since the Note, the only consideration which Debtor paid for the home, was for two-thirds of the home's value, Debtor received his one-third interest in that portion of the Trust assets at the time of the transfer, and the other two beneficiaries, Elaine and Steven, were to receive their share through distributions after payment of the Note.

Ted Loomis was The Peoples Bank trust officer primarily responsible for the Trust from 1984 until 2006 or 2007. Thereafter, Richard Mullin was the primary trust officer for the Trust, until he retired in December 2010. No distributions from the Trust to the Lunt Children were made in 2004, 2005, or 2006. Beginning in 2007, equal cash distributions were made on behalf of each child.[9]

By an e-mail to Richard Mullin, copied to Ted Loomis, dated December 16, 2009, Debtor complained about the administration of the Trust as it related to Luntacres Farm, Inc., a family farming operation, the stock of which is held at least in part by the Trust. Debtor stated that he believed that his sister and Ted Loomis were "calling the shots" and alleged that Ted Loomis was "running money through the Trust," or laundering money through the Trust. Debtor concluded the correspondence by stating that he had been thinking about what type of legal action could be taken. The following day, Debtor sent to the same individuals another e-mail concerning similar allegations of mismanagement and

---

[9] Adjustments were made to the cash distributions to Elaine and Steven to account for withholding of taxes, but these adjustments are not relevant to this case.

6

stating that he firmly believed that Steven and Elaine "are managing the Harry B. Lunt Trust."

By letter dated December 18, 2009, Richard Mullin responded to the allegations and also stated the following regarding distributions from the Trust:

> Historically, we have tried to make distribution of the net income of the trust to the three current beneficiaries. As you know, the trust agreement gives the trust the full discretion as to whether or not to make such distributions and, if so, in what amounts. In other words, the trust agreement does not require us to make distributions of income, nor must any such distributions necessarily be equal between beneficiaries.
>
> The reason I point this out is that we are quite concerned regarding your failure, since 1985, to make any payments on the note that had a face value of $33,333.33. Under its terms and with accrued interest, you now owe over $112,000. In accordance with the terms of an amendment to the trust, your Father wanted for us to distribute the cash from the note payment to Elaine and Steve after the death of your Mother. Not only are we not able to do that since you have not made payments on the note, but the note continues to accrue interest. While we intend to carry out the terms of the trust regarding any discretionary distribution of principal and/or interest to you, we must begin making any income payments that have historically been paid to you and use those amounts to make payments on your liability to the trust. If your circumstances would warrant a reconsideration of making a distribution directly to you, please, at any time, make application for us to reconsider our position.[10]

On December 19, 2009, Debtor again sent an e-mail to Richard Mullin and Ted Loomis in which he referred to a "civil law suit' against the bank. By an e-mail dated

---

[10] Dkt. 211-2 at 27-28.

April 15, 2010, to Ted Loomis, Debtor's attorney threatened to sue the bank for breach of fiduciary duty and conversion relating to the farm corporation.

In 2010, Richard Mullin recognized that Debtor's failure to make payments on the Note would preclude the express purpose of the Trust to divide the Trust assets equally among the three children. He testified in a deposition as follows:

> The primary thing was that I'd run an amortization schedule of that note plus its accrued interest, and I don't remember whether it had already reached but it was not too far from reaching a one-third share of the trust as it was valued at that time. And I was concerned that if we waited until 2024 that we would not be able to satisfy a one-third distribution of the trust to the three beneficiaries.[11]

On June 2, 2010, the Trustee determined to distribute $4,811 in accrued income to each beneficiary. But Debtor's distribution of $4,811 was not paid to him in cash. Instead it was applied to "interest on Notes." At the same time, cash distributions of $4,811 were made to Elaine and Steven, and the $4,811 to which Debtor would have been entitled was divided into two additional cash distributions of $2,405.50 that were made to Steven and Elaine.

**ANALYSIS.**

**A. The Nature of the Controversy.**

Debtor's memorandum in support of his motion for summary judgment presents four issues: (1) whether the discharge injunction applies to the Note; (2) whether the

---

[11] Dkt. 211-5 at 3.

doctrine of recoupment applies to the Trustee's setoff of interest on the Note against the June 2010 income distribution; (3) whether the Trust agreement gives the Trustee authority to exercise the setoff; and (4) if the bankruptcy injunction was violated willfully and in bad faith, whether Debtor is entitled to actual damages, attorney fees, and punitive damages. According to Debtor, the material facts are uncontroverted and based upon the foregoing issues, he is entitled to judgment as a matter of law.

The Trustee responds that: (1) setoff was authorized by the terms of the Trust and applicable law; and (2) the doctrine of recoupment does not allow Debtor to be enriched by his discharge in bankruptcy. Elaine and Steven respond to Debtor's motion and also move for summary judgment, contending that: (1) through the doctrine of recoupment, the Trustee could offset the interest against the distribution notwithstanding Debtor's prior discharge; and (2) in the alternative, the Trust granted the Trustee inherent authority to exercise setoff.

Although the parties contest the manner in which some of the facts are presented in the opponents' briefs, the material facts of this controversy, as found above, are uncontroverted. Under Rule 56,[12] made applicable to this contested matter by Bankruptcy Rules 9014(c) and 7056,[13] the Court is therefore authorized to grant the motion of a movant who is entitled to judgment as a matter of law.

**B. The Discharge Injunction of 11 U.S.C. § 524(a)(2) Applies to the Note, But**

---

[12] Fed. R. Civ. P. 56.

[13] Fed. R. Bank. P. 9014(c) and 7056.

9

**the Doctrine of Recoupment Is a Recognized Exception to the Injunction.**

As stated above, Debtor filed for relief under Chapter 7 on November 25, 1988. The Peoples Bank and the Trust were listed as creditors. A proof of claim for payment of the Note was filed. Debtor was granted a discharge on July 19, 1989. The Note was included in the discharged debts. The effect of a discharge is addressed by § 524(a)(2) as follows:

> (a) A discharge in a case under this title —
> . . .
>
> (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived.

The parties agree that the foregoing injunction applies to Debtor's personal liability on the Note.

However, as the parties recognize, under the doctrine of recoupment, the discharge injunction does not prohibit a creditor's defensive use of the discharged debt.[14] The controlling question in this case is whether the recoupment doctrine applies to the Trustee's offset. Recoupment originated as an equitable rule of joinder, allowing

---

[14] *Beaumont v. Dept. of Veteran Affairs (In re Beaumont)*, 586 F.3d 776, 781 (10th Cir. 2009) ("If the recoupment doctrine applies, then there is no 'debt' or 'claim' here as defined in the Bankruptcy Code, and Defendant has not violated the automatic stay nor the discharge injunction"); *Anthem Life Ins. Co. v. Izaguirre (In re Izaguirre)*, 166 B.R. 484, 493 (Bankr. N.D. Ga. 1994) ("Recoupment used as a defense does not contravene the fresh start policy implicit in the discharge provisions of the Bankruptcy Code."); *Harry Bradford Barrett Residuary Trust v. Barrett (In re Barrett)*, 410 B.R. 113, 122 (Bankr. S.D. Fla. 2009) ("Further, recoupment is not affected by the automatic stay, nor is exercising the equitable right a violation of the discharge injunction.").

10

adjudication in one suit of two claims that the common law required be brought separately.[15] "Under recoupment, a defendant could meet a plaintiff's claim with a countervailing claim that arose 'out of the same transaction.'"[16] In bankruptcy, "'[r]ecoupment' is an equitable doctrine . . . that allows one party to a transaction to withhold funds due another party where the debts arise out of the same transaction. In other words, the doctrine 'allows a creditor to recover a pre-petition debt out of payments owed to the debtor post-petition.'"[17] Determination of whether the doctrine applies in this case depends upon whether Debtor's obligation to pay interest on the Note arose out of the "same transaction" as his right to receive income distributions from the Trust.

To determine whether recoupment applies, the Court will reverse the order of issues two and three presented by the Debtor. It will first examine the two debts involved in the offset and their relationship under the Trust and Kansas law. Then the Court will examine recoupment in more detail.

### C. The Trustee's Offset Was Authorized under the Trust and Kansas Law.

The transaction which Debtor contends was not authorized by the Trust agreement and violated the discharge injunction is the Trustee's application of Debtor's June 2010 income distribution from the Trust to his interest obligation to the Trust under the Note.

---

[15] *Ashland Petroleum Co. v. Appel (In re B & L Oil Co.)*, 782 F.2d 155, 157 (10th Cir. 1986).

[16] *Id. (*citing J. Moore, *3 Moore's Federal Practice* ¶ 13.02, at 13-13 n. 1 (2d ed. 1985) and 20 *Am. Jur. 2d* Counterclaim, Recoupment, and Setoff, §§ 16-18 (1965)).

[17] *Beaumont*, 586 F.3d at 780 (*quoting Conoco, Inc., v. Styler (In re Peterson Distributing, Inc.)*, 82 F.3d 956, 959 (10th Cir. 1996), and *City of Fort Collins v. Gonzales (In re Gonzales),* 298 B.R. 771 (Bankr. D. Colo. 2003)).

11

To address Debtor's contentions, the Court must examine the Trustee's offset authority under Kansas state law.

Neither the Debtor nor any of the other parties challenge the authority of the Trustee to enter into the Note and to collect the amount due under the Note. Indeed, the Trustee had such authority. The Note was authorized by the 1985 Amendment of Trust Agreement. Authority to enforce the Note is found in K.S.A. 58a-815(a)(2)(A), a subsection of the Kansas Uniform Trust Code,[18] which grants to trustees of express trusts "[a]ll powers over the trust property which an unmarried competent owner has over individually owned property."

Likewise, neither the Debtor not any of the other parties challenge the authority of the Trustee to make the June 2010 income distribution. Kansas law allows the Trustee to apply Debtor's income distribution to payment of interest on the Note. Under the law of trusts, "[a] trustee who has a duty to pay or distribute property to a beneficiary should be able to set off against the sum due . . . (2) a liability of the beneficiary to the trustee in his representative capacity."[19] K.S.A. 58a-816(18) provides a trustee of an express trust may "make loans out of trust property, including loans to a beneficiary on terms and conditions the trustee considers to be fair and reasonable under the circumstances, and the trustee has

---

[18] The 1984 Amendment to Trust Agreement provides that the Trustee has "[A]ll powers expressly set forth in the Uniform Trustees Powers Act (K.S.A. 58-1201, et seq) as may be amended from time to time." The referenced act was repealed in 2002 and replaced by the Kansas Uniform Trust Code, K.S.A. 58a-101, *et seq*.

[19] George Gleason Bogert, George Taylor Bogert, and Amy Morris Hess, *The Law of Trusts and Trustees*, § 814, text associated with footnote 56 (current through 2011 update) (available under database identifier BOGERT at www.westlaw.com).

12

a lien on future distributions for repayment of those loans."

Under Kansas probate law, which is similar to the law of express trusts, an heir "is entitled to his distributive share of real property belonging to the estate only after all equities in favor of the estate against him personally have been satisfied."[20] The debt of a distributee to an estate and interest thereon may be offset as a deduction from the distributee's share of the estate, even though the statute of limitations has run on enforcement of the note.[21] Such offset is an equitable right, not the technical right of set-off available in actions at law.[22]

Under the Bankruptcy Code, discharge eliminates the debtor's personal liability on the obligation but does not "absolve the underlying debt retroactively."[23] "[A] bankruptcy discharge extinguishes only one mode of enforcing a claim — namely an action against the debtor *in personam*."[24] As a matter of state law, discharge of the debt, like the running of the statute of limitations, does not provide the beneficiary a defense to offset. Reported decisions from at least two states have upheld offset by a trustee to satisfy a discharged debt to a trust. The Minnesota Court of Appeals has held that the trustee of an express

---

[20] *Blackwood v. Blackwood*, 120 Kan. 72, 72 Syl. ¶ 1, 242 P.451, 452 Syl. ¶ 1 (1926).

[21] *In re Estate of Wernet*, 226 Kan. 97, 108-09, 596 P.2d 137, 147 (1979).

[22] *Blackwood*, 120 Kan. at 74-75, 242 P. at 452 (*quoting Webb v. Fuller*, 85 Me. 443, 27 A. 346 (1893)).

[23] 3 William L. Norton, Jr., and William L. Norton III, *Norton Bankr. Law & Practice 3d*, § 58:2 at 58-6 (Thomson Reuters/West 2012).

[24] *Johnson v. Home State Bank*, 501 U.S. 78, 84 (1991).

13

trust may exercise discretion granted by the trust documents to offset distributions to a beneficiary to satisfy a discharged debt.[25] The Massachusetts Supreme Court has held a trust provision directing that if any beneficiary is indebted to the donor at the time of distribution, such indebtedness must be deducted from the beneficiary's distributive share, applies to debts which have been discharged in bankruptcy, reasoning that discharge does not extinguish the obligation [26]

Further, the Court finds that the Trustee's application of Debtor's income distribution to the interest under the Note was a proper method to effect the Grantor's intent that distributions of principal to the beneficiaries upon termination of the Trust in 2024 be equal. This intent is stated in Article VI of the 1984 Amendment to Trust Agreement, which also provides that to accomplish this goal, the Trustee should consider all transfers to the Grantor's children. Article VI(C)(4) provides:

> Upon termination, the Trustee shall distribute the principal and any accrued and undistributed income of the trust in equal shares to the children of the Grantor, provided, the Trustee is authorized and empowered to make unequal distribution of the principal and any accrued and undistributed income in cash or in kind in order to carry out the desires of the Grantor for the Trustee to consider all transfers to Grantor's children that have been made by the Grantor and his wife by Will or otherwise. Any loans made by Grantor or his wife which have not been repaid shall be treated as transfers by the Trustee, whether or not the statutes of limitation have run. The decision of the amounts of the transfers shall be in the Trustee's sole and absolute discretion and the decision of

---

[25] *Hurtig v. Gabrielson*, 525 N.W.2d 612 (Minn. App. 1995).

[26] *Groden v. Kelley*, 382 Mass. 333, 415 N.E. 2d 850 (1981).

14

the Trustee shall be final.

In 2010, the Trustee determined that if the Note was not paid and interest continued to accrue, then upon termination of the Trust, the amount of the "transfer" to Debtor arising from the Note and accrued interest would exceed the anticipated principal available for distribution to Elaine and Steven. In an attempt to remedy this problem in part, the Trustee in his discretion determined to use income payments, which had historically been paid to Debtor, to make payment on Debtor's liability to the Trust. Debtor was advised of this position in a letter to him from Richard Mullin dated December 18, 2009, and in June 2010, Debtor's share of the 2010 income distribution was applied to interest on the Note. Debtor's one-third share of the income to be distributed was $4,811. Annual interest under the Note was $3,333.33 and the accrued interest was approximately $79,000.

Debtor contends that the Trustee's reliance upon the foregoing provision of the Trust regarding distribution of principal at termination is improper because: (1) the Note was discharged; (2) the Note is not a loan; (3) the distribution was of interest, not principal; and (4) the sale of property which gave rise to the Note was not a transfer by the Grantor or his wife. The foregoing discussion disposes of Debtor's first argument; as a matter of state law, the discharge does not bar offset. Debtor's second argument, that the Note is not a loan, rests upon the fact that the Note is for payment of the value of property transferred to Debtor and his wife by the Trust, not for cash advanced to them. The Court rejects this restrictive construction of the Trustee's authority. It is only the second sentence of the foregoing provision of the Trust which refers to loans, and reliance on that

15

sentence is not necessary to support the Trustee's actions. The Trust directs the Trustee to consider "all transfers" and gives the Trustee full power to decide the "amounts of the transfers." The Trust's conveyance of real property to Debtor and his wife on credit was a transfer; the Trustee has determined that the projected credit of the transfer on the date of termination of the Trust will be the amount of principal and accrued interest on the Note, and that determination is final. Debtor's third argument, that offset was not authorized by Article VI(C)(4) because the distribution was of interest, not principal, also fails. The Trustee relies upon that article as providing a reason to exercise offset, not as providing the express authority for doing so. That authority is discussed above. Debtor's fourth argument, that the Trustee's action is unauthorized because the transfer of the real property was by the Trust, rather than the Grantor and his wife, likewise fails. The Trust provision is broadly written to apply to "all transfers to Grantor's children that have been made by the Grantor and his wife by Will or otherwise." The use of the broad term "otherwise" is sufficient to cover transfers by the Trust established by the Grantor.

The Court therefore concludes that the Trustee's action in offsetting the Debtor's interest obligation under the Note against the income distribution was in accord with the Trust provisions and applicable Kansas law.

**D. The Offset Did Not Violate the Discharge Injunction Because the Doctrine of Recoupment Applies.**

Whether the Trustee's actions, even though in accord with state law and his authority under the Trust, constituted a violation of the discharge injunction is a matter of

16

federal law. Section 524(a)(2) of the Bankruptcy Code provides that a discharge "operates

as an injunction against . . . an act, to collect, recover or offset any such debt as a personal

liability of the debtor, whether or not discharge of such debt is waived." But if the

recoupment doctrine apples, then there is no "debt" as defined in the Bankruptcy Code,

and there is no violation of the injunction.[27]

Recoupment applies only when the two debts arose out of the "same transaction."

The Tenth Circuit has adopted the Third Circuit's "single integrated transaction"

definition of the phrase "same transaction.[28] Under this construction, "same transaction"

means that "'both debts must arise out of a single integrated transaction so that it would be

inequitable for the debtor to enjoy the benefits of that transaction without also meeting its

obligations.'"[29] When adopting this test, the Tenth Circuit emphasized the equitable basis

for the narrow construction. The Circuit reasoned that the "'same transaction' requirement

acts as a mechanism to ensure that equitable reasons for recoupment are present."[30] Under

this test, when the issue is whether offset violates the discharge injunction, the Circuit

---

[27] *Beaumont*, 586 F.3d at 781.

[28] *Peterson Distributing*, 82 F.3d 956, 960 (10th Cir. 1996) (*citing University Medical Ctr. v. Sullivan (In re Univ. Medical Ctr., Inc.)*, 973 F.2d 1065, 1081 (3rd Cir. 1992)).
    Elaine and Steven urge this Court to construe the same transaction requirement for recoupment using the "logical relationship" test. Dkt. 233 at 12-16. This is a less strict test of relationship than the "single integrated transaction" test. But the "logical relationship" test was expressly rejected by the Third Circuit in *University Medical Center*, 973 F.2d at 1081, when it adopted the "single integrated transaction" test, and the Tenth Circuit has expressly adopted the Third Circuit's narrow construction. *Peterson Distributing*, 82 F.3d at 960-61.

[29] *Peterson Distributing*, 82 F.3d at 960 (*quoting University Medical*, 973 F.2d at 1081).

[30] *Id*. at 960-61.

17

examines the "equities of the case, and determine[s] whether the claims 'are so closely intertwined that allowing the debtor to escape its obligation would be inequitable.'"[31]

Examination of Tenth Circuit recoupment decisions illuminates the test. In *Davidovich*,[32] the debtor, an attorney, brought an action against his former law partner to recover an amount awarded to him in an arbitration proceeding. Debtor's former partner responded by seeking to set the debtor's arbitration award off against two claims he held against the debtor, one arising from the same arbitration proceeding as the debtor's claim and the other for funds that the former partner had paid into the law partnership when the debtor failed to make a capital contribution. The Tenth Circuit allowed recoupment as to the claims arising from the arbitration proceeding; both debts arose from "a single integrated transaction, the binding arbitration proceeding . . . such that it would be inequitable for Davidovich to enjoy the benefits of that transaction without meeting its obligations."[33] However, recoupment was not allowed as to the partnership contribution, because the right to compensation arose under the partnership agreement and not the arbitration award which was the basis for the debtor's claim.[34]

In *Peterson Distributing,*[35] the Tenth Circuit expressly adopted the Third Circuit's

---

[31] *Beaumont,* 586 F.3d at 781 (*quoting Peterson Distributing,* 82 F.3d at 960).

[32] *Davidovich v. Welton (Davidovich)*, 901 F.2d 1533 (10th Cir. 1990).

[33] *Id.* at 1537.

[34] *Id.* at 1538.

[35] *Peterson Distributing*, 82 F.3d at 960.

18

"single integrated transaction" test and emphasized the equitable foundation of the doctrine which had been recognized in prior Tenth Circuit opinions. In *Peterson Distributing*, the Chapter 7 debtor was a franchisee of creditor Conoco and opposed Conoco's attempt to offset or recoup $69,370.49 worth of credit card invoices owed to the debtor against Conoco's $245,159.06 claim against the debtor for purchases of Conoco products. The credit card invoices had been accepted by the debtor from its customers who purchased Conoco and other products and services. Under the franchise agreement, Conoco agreed to accept the invoices and pay the debtor the face amount of the invoices, less three percent. The Tenth Circuit held that the two obligations did not arise from a single integrated transaction.[36] Although both obligations were governed by a single franchise agreement, that agreement attempted to set forth the entire business relationship between Conoco and Peterson and therefore governed many transactions. Further, the Circuit found that "no overriding equitable reason exists that compels the application of the doctrine of recoupment;"[37] in that case; rather, allowing recoupment would have unjustly enriched Conoco to the detriment of other creditors.

In *Beaumont*,[38] the Tenth Circuit held that recoupment by the Department of Veteran Affairs (VA) of prepetition overpayments of disability benefits to the debtor from postpetition benefits owed to the debtor did not violate the automatic stay or the discharge

---

[36] *Id*. at 961-63.

[37] *Id*. at 962.

[38] *Beaumont*, 586 F.3d 776.

19

injunction. The debtor was a disabled veteran who began receiving disability benefits in 1993. In 2001, he received a probate distribution. Pursuant to federal law, the debtor's benefits were subject to being reduced by the amount of any income he received, including an inheritance. In the spring of 2005, after learning of the inheritance, the VA advised the debtor that he owed $18,448 because of the inheritance and that it intended to collect the claim by offsetting future disability payments owed to the debtor, as was expressly permitted by statute. The debtor responded by filing for bankruptcy relief, and the VA continued to offset his benefits during the bankruptcy proceedings. The debtor contended this conduct violated the automatic stay and the discharge injunction. The Tenth Circuit disagreed.

> This Court finds that the obligations of both parties did arise from the "same transaction." Plaintiff's [debtor's] claim for and award of pension benefits generated the Defendant's [VA's] obligation to pay those benefits. The Defendant's obligation to pay benefits was and is contingent upon Plaintiff's financial situation, his annual income, and his responsibility to keep the Defendant informed of his financial situation. Plaintiff's inheritance had the effect of reducing the amount of benefits he could receive from the Defendant. Therefore, Plaintiff's inheritance was directly related to or intertwined with the amount of benefits Defendant was obligated to pay to him, and the resulting overpayment of benefits. It is unlawful for Plaintiff to keep any overpayments so long as the Defendant, through its own administrative procedures, has properly determined the amount of overpayment and properly considered Plaintiff's disagreement with that determination. The Court believes that it would be inequitable for the Plaintiff to receive his inheritance, continue to receive benefits as if his income was zero, then be able to discharge in bankruptcy the overpayments once it was

determined that he had been overpaid.[39]

In this case, Debtor's obligation to the Trust involved in the setoff is his liability for interest on the Note. As discussed above, the effect of discharge is limited to Debtor's personal liability under the Note. Section 524 "does not address the continuing validity of the discharged debt."[40] Therefore, discharge did not extinguish the obligation to the Trust or affect the accrual of interest.[41] Interest continues to accrue on the Note at the rate of $3,333.33 per year. With respect to the year for which the income distribution was made, there is no doubt that Debtor's obligation for that interest and the Debtor's right to an income distribution are intertwined. Both relate to the administration of the Trust during the same time period and to Debtor's then current rights and obligations. The recoupment here is very similar to the recoupment in *Davidovich*, where both debts arose from the same arbitration award. It would be inequitable for the Debtor to receive an income distribution for the same period of time for which he was not honoring his obligation to pay interest.

This leaves the question whether the Trustee violated the discharge injunction by

---

[39] *Id*. at 781.

[40] 3 *Norton Bankruptcy Law & Prac. 3d*, § 58:2 at 58-6.

[41] *See Bank of Prairie v. Picht (In re Picht)*, 428 B.R. 885, 891 (10th Cir. BAP 2010) (after discharge of a secured debt, the secured debt continues to exist and is enforceable against the property securing the debt; the lien survives and its value is not in any way limited or stripped by the discharge); *Hagemann v. Chemical Mortgage Co. (In re Hagemann)*, 86 B.R. 125 (Bankr. N.D. Ohio 1988) (holding that discharge did not bar mortgage foreclosure action to enforce *in rem* rights to recover principal and interest for the period of time before and after discharge, up to the value of the collateral).

21

offsetting the remaining $1,477.67[42] against Debtor's interest obligation for a prior year. The Court finds there was no violation. Although these two transactions are not as closely related in time as are Debtor's 2010 interest obligation of $3,333.33 and a portion of the 2010 trust distribution equal to that amount, they still satisfy the "single integrated transaction" test. The distribution of income is related to the accrued interest because, absent recoupment, the Note plus accrued interest would exceed Debtor's one-third interest in the principal of the Trust. Here, as in *Beaumont*, where past overpayments were offset against current benefits, the offset is authorized by non-bankruptcy law. Unlike *Peterson Distributing*, there are no creditors whose rights will be adversely affected, so the only bankruptcy policy impacted is Debtor's fresh start as implemented by the discharge injunction. This interest in a fresh start pales when compared with the Trustee's interest in carrying out the Grantor's intent to equalize the principal distributions to the beneficiaries upon termination of the Trust. And allowing recoupment promotes equity. Because of Debtor's discharge, the Trustee is prohibited from enforcing the Note as a personal liability of Debtor. As a result, Elaine and Steven will not receive their distributions of the Note principal, which distributions are specifically provided for in the Trust amendment authorizing the Note. Application of the discharge injunction as a shield to prevent the offset of income distributions against Debtor's interest obligations would compound the injustice by allowing Debtor to benefit from current distributions from the Trust without

---

[42] Calculated by subtracting $3,333.33, one year's interest, from the $4,811 income distribution.

22

having to comply with his duties to the Trust.

**E. Debtor's Motion for Summary Judgment on his Motion for Contempt Is Denied.**

The linchpin of Debtor's motion to hold the Trustee in contempt is the contention that the June 2010 offset of his income distribution to satisfy a portion of the accrued interest on the Note was a violation of the discharge injunction of § 524(a)(2). The material facts concerning the setoff are uncontroverted. And, for the reasons stated above, the Court has found that the doctrine of recoupment applies to the offset, so that there was no violation of the discharge injunction. Debtor's motion for summary judgment on his motion for contempt is therefore denied.

Denial of the motion for for summary judgment on the motion for contempt renders moot Debtor's allegations, based upon Debtor's correspondence with the Trustee in late 2009 and 2010, that the Trustee willfully violated the discharge injunction and acted in bad faith. The Court therefore does not address the Debtor's fourth issue.

**F. Elaine Stelter's and Steven Lunt's Motion for Summary Judgment Is Granted.**

Elaine and Steven filed a cross motion for summary judgment. They contend that the material facts are uncontroverted and as a matter of law, judgment should be entered against Debtor, since the Trust is entitled to recoup Debtor's interest obligation. For the reasons stated above, the Court agrees. The motion for summary judgment filed by Elaine Stelter and Steven Lunt is granted.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rules

23

7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure, which make Rule 52(a) of the Federal Rules of Civil Procedure applicable to this matter.

**JUDGMENTS**.

Judgment is hereby entered denying Debtor's Motion for Summary Judgment[43] and granting Elaine L. Stelter's and Steven A. Lunt's Cross Motion for Summary Judgment.[44] The judgments based on this ruling will become effective when the ruling is entered on the docket for this case, as provided by Federal Rule of Bankruptcy Procedure 9021.

**IT IS SO ORDERED.**

**# # #**

---

[43] Dkt. 211.

[44] Dkt. 233.

Case 10-13712   Doc# 241   Filed 08/31/12   Page 24 of 24